IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ROBERT AINSWORTH, as Personal Representative of the ESTATE OF RA, as Father and General Guardian of JA, a minor, and for himself,<br><br>Plaintiff,<br><br>v.<br><br>PARK CITY POLICE DEPARTMENT, PARK CITY SCHOOL DISTRICT, and various employees of both, including but not limited to, DARWIN LITTLE, EMILY SUTHERLAND, NICHOLI JENSEN, and John and Jane Does 1-10,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTIONS TO DISMISS**<br><br>Case No. 2:19-cv-00462<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Robert Ainsworth, on his own behalf and as personal representative of the estate of a deceased son and as father and general guardian of another minor son, brought this action against the Park City Police Department, the Park City School District, and various Department and District employees, including Lieutenant Darwin Little, Principal Emily Sutherland, Nicholai Jensen, and John and Jane Does 1-10.[1] Mr. Ainsworth sues under 42 U.S.C. § 1983, alleging violations of the Due Process Clause of the Fourteenth Amendment. *See* Dkt. No. 2 ¶ 4 ("Compl."). Defendants have moved to dismiss, arguing that Mr. Ainsworth fails to allege a constitutional violation and that the individual Defendants are entitled to qualified immunity. *See* Dkt. Nos. 23, 32. The court grants the motions to dismiss.

---

[1] Although Mr. Ainsworth sues the Park City Police Department, the Police Department is a governmental sub-unit of Park City Municipal Corporation, not a separate legal entity. *See e.g.*, *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985). The court will accordingly treat his claims against the Police Department as claims against the City.

1

I.

Mr. Ainsworth was the father of two young boys, RA and JA, who were 13 and 15 years old when the events giving rise to this suit took place. *See* Compl. ¶ 5. On August 30, 2016, JA and 4 other children were stopped by the Summit County Sheriff's Office at a Best Buy store. *See id.* ¶ 17. They were found with a bottle containing a colorless liquid, originally reported to be Benadryl. *See id.* The liquid was later determined to be U-47700, also known as "Pink" or "Pinky." *See id.* ¶ 18. This was the Park City Police Department's first encounter with U-47700. *See id.* ¶¶ 17–20.

U-47700 is an exceptionally dangerous, potentially lethal synthetic opioid. *See id.* ¶ 19. Both the Police Department and the School District, as well as several of their employees, became aware of U-47700 and the extreme danger it posed when CS, a student at Park City High School, overdosed on the substance and was hospitalized on September 3, 2016. *See id.* ¶¶ 20–21, 24–25.

On September 6, 2016, Mr. Ainsworth was informed of the August 30 incident—presumably by one of the Defendants, though Mr. Ainsworth's allegations are not clear on this point—but he was told that the substance in the bottle was Benadryl. *See id.* ¶ 22. He was not told that it was U-47700 or warned of the dangers of this substance. *See id*. That night, Mr. Ainsworth received a text message from Jill Ainsworth, his former wife and the mother of JA and RA, notifying him that CS had "overdosed over the weekend and tested positive for benzoids." *Id.* ¶ 44. Mr. Ainsworth then made a thorough search of his house and found no drugs other than prescription medications. *See id.* ¶ 49.

On September 8, 2016, Mr. Ainsworth had JA evaluated for drug use by his therapist, who concluded that JA was not using illegal drugs. *See id.* ¶¶ 103–04. On September 11, 2016,

2

GS, a friend of JA and RA, died after taking U-47700. *See id.* ¶¶ 54–57. Later that day, Mr. Ainsworth had a long discussion with JA about substance abuse. *See id.* ¶ 57. Mr. Ainsworth also made a second thorough search of his house, again finding only prescription medications. *See id.* ¶ 58.

At some point after GS's death but before RA's death, GS's parents told the Police Department that they intended to call Mr. Ainsworth and warn him that RA probably possessed and was using U-47700. *See id.* ¶ 135. Lieutenant Little, however, instructed them not to do so. *See id.* ¶ 136. Lieutenant Little later testified at a deposition in another case[2] that he stopped GS's parents from calling Mr. Ainsworth because he did not want "an emotional parent calling and accusing another parent of doing something when it should be law enforcement's responsibility to make those connections and contacts." *Id.* ¶ 138 (quoting Dkt. No. 3-1 at 4). Lieutenant Little further testified that although he did not contact Mr. Ainsworth himself, he thought other law enforcement officials had done so, but that he did not remember for certain and "could be mistaken." *Id.* ¶ 139–40 (quoting Dkt. No. 3-1 at 3). Lieutenant Little testified that in hindsight he "wish[ed]" he had "made that phone call" and that "[m]aybe that's something that could have been done to prevent [RA's] death." *Id.* ¶137 (quoting Dkt. No. 3-1 at 4).

On September 12, 2016, the morning after GS's death, police and school officials met JA and RA as they entered the school building and seized their school-issued computers. *See id.* ¶ 60. The same morning, Mr. Ainsworth came to RA's school at school officials' request to discuss their concern for RA's safety in light of GS's death. *See id.* ¶ 61. Mr. Ainsworth met with school officials including two of the individual Defendants, Principal Sutherland and Mr.

---

[2] *See James Seaver et al., v. Edward Shapard et al.*, No. 180500150 (Utah Dist. Ct.).

Jensen. *See id.* ¶ 62. RA was also present for most of the meeting. *See id.* ¶ 63. During this meeting, school officials told Mr. Ainsworth that the Police Department had instructed them not to disclose any information about GS's death because a police investigation was ongoing. *See id.* ¶ 65. School officials nevertheless told Mr. Ainsworth that the police believed GS may have taken "Pink" or "Pinky" but did not inform Mr. Ainsworth of GS's contact with RA. *Id.* ¶¶ 71– 72. The officials indicated that they were extremely concerned about RA's safety, however, and they strongly recommended that Mr. Ainsworth take RA directly to the emergency room. *See id.* ¶¶ 67–69.

After this meeting, Mr. Ainsworth immediately took RA to the Park City Medical Center Emergency Department, where RA was evaluated and screened for substance abuse at Mr. Ainsworth's request. *See id.* ¶¶ 76–80. While at the waiting room, Mr. Ainsworth searched the internet for information about "Pinky" or "Pinkie"—the allegations are not clear which—but found nothing about any substance with that name. *See id.* ¶¶ 79, 82. Mr. Ainsworth then sent a text message to Mr. Jensen, stating that he had been unable to find anything about "Pinkie" and asking for more information about the substance. *Id.* ¶ 82. Mr. Jensen immediately sent a text message responding that he was checking with the police but that "the substance may be called U-47700." *Id.* ¶ 83. This was the first time Mr. Ainsworth heard of U-47700. *See id.* RA was released from the ER later the same day after the hospital found no evidence of substance abuse and concluded that RA was not at risk of self-harm. *See id.* ¶ 90.

At around close of business the same day, the School District sent a community drug alert by email to students' parents, including Mr. Ainsworth, and perhaps to other members of the community (the allegations are again unclear) warning of "U-47700/Pink/Pinky" and including information about two fatal overdoses in Salt Lake County and Iron County. *Id.* ¶¶ 91–96. This

4

alert was jointly authored by the Police Department, the School District, and the Statewide Information Analysis Center, and it urged parents to call local law enforcement immediately if they thought their children might be in possession of U-47700. *See id.* ¶¶ 91, 96.

Later that evening, Ms. Ainsworth sent Mr. Ainsworth a text message informing him that she suspected the boys could be in possession of "this pinky stuff." *Id.* ¶ 106. She specifically suggested that Mr. Ainsworth search JA's black backpack. *See id.* Mr. Ainsworth then made his third thorough search of the entire house and the boys' possessions, including JA's black backpack, and again found no drugs other than prescription medications. *See id.* ¶ 107. That night, JA and RA were in good spirits and Mr. Ainsworth went to bed believing his children were not at risk. *See id.* ¶ 110.

The next morning, September 13, 2016, RA was found dead on the sofa at home and the police discovered a vial containing U-47700 when they searched JA. *See id.* ¶¶ 111–18. Mr. Ainsworth then took JA to his former residential treatment center where familiar professionals could observe him around the clock. *See id.* ¶ 121. JA remained in residential treatment for two years. *See id.* ¶¶ 132–33.

On July 3, 2019, Mr. Ainsworth brought this action. Soon after, the School District and the City each filed a motion to dismiss.

## II.

Defendants contend that the individual Defendants, including Principal Sutherland, Mr. Jensen, and Lieutenant Little, are entitled to qualified immunity. To overcome this defense, Mr. Ainsworth must establish that these individuals "violated a federal statutory or constitutional right" and that "the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). When, as

5

here, qualified immunity is raised in a motion to dismiss, the court accepts the well-pleaded facts contained in the complaint as true and construes them in the light most favorable to the plaintiff. *See, e.g., Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014).

Mr. Ainsworth alleges that the individual Defendants withheld important details of his children's involvement with U-47700 and the dangers of the substance, which prevented him from providing critical protective care to his children when they were in imminent danger. *See* Compl. ¶¶ 29–31. Mr. Ainsworth alleges that this conduct violated his, and his children's, clearly established rights under the Due Process Clause of the Fourteenth Amendment. For the following reasons, the court finds that the individual Defendants' actions did not violate the Due Process Clause. *A fortiori*, these actions did not violate Mr. Ainsworth's or his children's clearly established rights. The individual Defendants are accordingly entitled to qualified immunity.

**A.**

In general, the Constitution, including the Due Process Clause of the Fourteenth Amendment, protects citizens against actions *by the government*. As the Supreme Court has emphasized time and again, the "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)). It is thus well settled that a "state is not required to provide its citizens with 'particular protective services' under the Due Process Clause, and 'failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'" *Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1261 (10th Cir. 1998) (quoting *DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 197 (1989)). More generally, the Due Process Clause does not require a state or

local government to protect its citizens from "mishaps not attributable to the conduct of its employees." *Deshaney*, 489 U.S. at 193–94 (citations omitted).

There are two exceptions to this general rule. The first exception, known as the special relationship doctrine, applies "when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Armijo*, 159 F.3d at 1260 (citations omitted). The second exception, sometimes referred to as the danger creation doctrine, applies in some circumstances when the government "created the danger that harmed the individual." *Id.* (citations omitted).

Here, the individual Defendants did not provide RA with U-47700 or cause him to abuse it. Rather, RA died as a result of his own actions. It follows that the individual Defendants did not violate the Due Process Clause unless one or both of these exceptions applies. The court considers each in turn.

**B.**

Although the Due Process Clause imposes no affirmative obligation on officials to provide particular protective services, a duty may arise if a "special relationship" exists between the government and an individual. As noted, such a relationship "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Id.* (citations omitted). Inaction by the government in the face of a known danger is not enough to trigger any obligation under the special relationship doctrine. *See Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994). As the Tenth Circuit has explained, "foreseeability cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship." *Id.* at 994. Rather, a special relationship exists only if a State

"restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty." *Armijo*, 159 F.3d at 1261; *see also Graham*, 22 F.3d at 995.

The classic example of such assumption of control is when the government "takes a person into its custody and holds him there against his will." *DeShaney*, 489 U.S. at 199–200. When the government does so, "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 200. In such circumstances, the affirmative duty to protect "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* The Supreme Court has recognized this affirmative duty in only a few limited situations, such as when the government incarcerates individuals or commits them to mental health institutions against their will. *See DeShaney*, 489 U.S. at 198–199; *see also, e.g.*, *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that suspects in police custody who have been injured while being apprehended by the police must be given medical care by the government); *Youngberg v. Romeo*, 457 U.S. 307, 314–25 (1982) (holding that the government must provide involuntarily committed individuals with services that are necessary to ensure their reasonable safety from themselves and others); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding that the government must provide adequate medical care to prisoners).

Since *DeShaney*, the Tenth Circuit has extended the list of situations in which such an affirmative duty arises to include the government's placement of children in foster care because such children are in the government's legal and physical custody. *See Yvonne L., By & Through Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 885 (10th Cir. 1992). In *Yvonne L.*, the court highlighted that young children placed in foster care are "taken by the state from their

8

parents for reasons that generally are not the fault of the children themselves" and are thus similarly situated to involuntarily committed patients. *Id.* at 894; *see also Matthews v. Bergdorf*, 889 F.3d 1136, 1146 (10th Cir. 2018) (citing *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000)).

But "this is as far from *DeShaney* as [the Tenth Circuit has] ventured." *Matthews*, 889 F.3d at 1146. Indeed, that court has expressly declined to venture further. In *Matthews*, the plaintiffs sued the Oklahoma Department of Human Services and its employees, alleging that the State had violated the Due Process Clause by allowing several children to live with an abusive couple. *See id.* at 1142. Some of the children had been placed with the abusive couple by the State through foster care, some had been adopted by the couple, some were under the couple's legal guardianship, and some were just living there. *See id.* at 1146. The court analyzed each child separately and held that "a child alleged to be adopted, living with an adult pursuant to a guardianship, or 'just living' with an adult is not in the custody of the State and, unlike a foster child, does not have a special relationship with the State." *Id.* The court reiterated that "the classic examples are prisoners, individuals committed against their will to mental institutions, and individuals in state run foster care," because the government "has a special relationship with only individuals dependent completely on the state to satisfy their basic human needs." *Id.* (quoting *DeAnzona*, 222 F.3d at 1234).[3]

---

[3] To be sure, Mr. Ainsworth cites a decision from the Utah Supreme Court holding that a "special relationship" may arise when a government agent undertakes specific action to protect a person or property or otherwise acts in a way that reasonably induces detrimental reliance by a member of the public. *See* Compl. ¶ 150–52 (citing *Francis v. State, Utah Div. of Wildlife Res.*, 321 P.3d 1089, 1095 (Utah 2013)). But this decision did not purport to address the scope of the Fourteenth Amendment's Due Process Clause; rather, it involved a state law negligence claim. *See Francis*, 321 P.3d at 1093. Although the Utah Supreme Court used the same term, "special relationship," it thus did so in a different context—imposing a duty of care under state tort law—that is irrelevant to the scope of the Fourteenth Amendment. As the Supreme Court made clear in

9

In this case, the court concludes that neither the school officials, including Principal Sutherland and Mr. Jensen, nor the police officers, including Lieutenant Little, "assume[d] control over [Mr. Ainsworth or his children] sufficient to trigger an affirmative duty to provide protection" to them. *Armijo*, 159 F.3d at 1260.

### 1.

Mr. Ainsworth fails to allege any facts that could support a reasonable inference that Principal Sutherland, Mr. Jensen, or any other School District employee assumed such control over Mr. Ainsworth or his children. The facts that Mr. Ainsworth's children were enrolled in public school and required to attend school under state law do not suffice to create a special relationship under the Due Process Clause, and Mr. Ainsworth has failed to allege anything else that could have created such a relationship.

"Following *DeShaney*" the Tenth Circuit has "examined the custodial nature of compulsory school attendance laws" and it has repeatedly and "clearly held compulsory school attendance laws do not spawn an affirmative duty to protect under the Fourteenth Amendment." *Graham*, 22 F.3d at 994 (citing *Maldonado v. Josey*, 975 F.2d 727 (10th Cir.1992)). In *Graham*, the Tenth Circuit thus rejected the argument that "the quasi-custodial nature of school attendance satisfies the standards articulated in *DeShaney*," even when "coupled with" a school's "knowledge of the violent propensities of one of its students." *Id*. There, the court held that the

---

*DeShaney*, although a State may, "through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes," "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202; *see also id*. (explaining that not all "common-law duties owed by government actors [are] . . . constitutionalized by the Fourteenth Amendment").

10

defendant school districts were not liable when one student was shot and killed and another was stabbed by fellow students on school grounds because "no special relationship existed between the plaintiffs and defendants." *Id.* at 995. The court explained that "[i]n the absence of a custodial relationship, . . . plaintiffs cannot state a constitutional claim based upon the defendants' alleged knowledge of dangerous circumstances." *Id*. And in *Seamons v. Snow*, the Tenth Circuit reaffirmed that "[c]ompulsory attendance laws for public schools" do not "create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school," and that "schools have no duty under the Due Process Clause to protect students from assaults by other students, even where the school knew or should have known of the danger presented." 84 F.3d 1226, 1235–36 (10th Cir. 1996). The court thus concluded that because a high school and its officials had not limited a student's "freedom to act on his own behalf," when he suffered hazing by five of his upper-class football teammates in the school's locker room, "no special relationship arose triggering a constitutional obligation" to protect him. *Id.* at 1236.

Nor do the specific actions alleged to have been taken by Principal Sutherland, Mr. Jensen, and other school officials come close to establishing anything like "incarceration, institutionalization, or other similar restraint of personal liberty" and thus to give rise to an affirmative duty to protect Mr. Ainsworth or his children. *DeShaney*, 489 U.S. at 200. Certainly, none of Mr. Ainsworth's allegations support a reasonable inference that Principal Sutherland, Mr. Jensen, or any other school official limited the Ainsworths' "freedom to act to protect [themselves] *through a restraint on [their] personal liberty*," *Armijo*, 159 F.3d at 1261 (emphasis added), or that Mr. Ainsworth or his children were "dependent completely on the state to satisfy their basic human needs," *Matthews*, 889 F.3d at 1146.

11

To be sure, Mr. Ainsworth and RA were called into a meeting at the school on September 12, 2016. *See* Compl. ¶¶ 61–69. But Mr. Ainsworth has failed to allege any other limitations imposed by school officials on his or his children's freedom to act on their own behalf. *Cf. DeShaney*, 489 U.S. at 200. And even indulging the fanciful assumption that this meeting constituted a restraint on RA's (or Mr. Ainsworth's) personal liberty comparable to incarceration or institutionalization, RA's overdose did not take place during the meeting. Rather, RA's overdose occurred at home, off school property, outside school hours, and had no connection to any school sponsored activity or event.

Indeed, school officials' role in these tragic events is even more attenuated than in *Armijo*, where the Tenth Circuit found that no special relationship existed between the school and a special education student who committed suicide while alone at home after school officials suspended him, drove him home, left him there without supervision, and failed to inform his parents of these actions. *See Armijo*, 159 F.3d at 1261–62. There, the court held that "[b]anning a student from the school grounds does not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual" and the fact that the student "ended his life *after* he was 'released' by [the school counselor] bars any liability under the special relationship doctrine." *Id.* (emphasis in original). At most, the student was "confined in [the school counselor's] car during the drive home from school" and "[e]ven if such circumstances constituted a custodial relationship, that relationship ended once [the student] exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official." *Id.* at 1261. Here also the allegations simply cannot support any reasonable inference that school officials imposed any limitations on Mr. Ainsworth or his children's freedom to act on their own behalf in their own home, at night, when the fatal overdose occurred.

**2.**

Mr. Ainsworth has likewise failed to allege that Lieutenant Little or any other police officer assumed control over the Ainsworths sufficient to trigger an affirmative duty to protect them. The police did not restrain the personal liberty or freedom of Mr. Ainsworth or his children: neither Mr. Ainsworth nor his children were arrested, placed in custody, or otherwise restrained by the police in any way that prevented them from acting on their own behalf. *See* Dkt. No. 32 at 15. The closest the police came to assuming any "control" at all was when they seized JA's and RA's school-issued computers. *See* Compl. ¶ 60. But the court does not believe that this action involved the type or degree of restriction of personal liberty necessary for the special relationship exception to apply. In all events, neither Mr. Ainsworth nor his children were subject to any control by the police in their own home, at night, when the tragedy took place.

**C.**

In some circumstances, the Due Process Clause may also require the government to protect an individual from private harm under the "danger creation" exception if it "affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). "The Supreme Court planted the seed for such a 'creation of danger' theory in explaining the case of Joshua DeShaney: '[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it *played no part in their creation*, nor did it do anything to render him *any more vulnerable to them*.'" *Uhlrig v. Harder*, 64 F.3d 567, 572 n.7 (10th Cir. 1995) (quoting *DeShaney*, 489 U.S. at 201) (emphasis in *Uhlrig*). Although many government actions have the potential to create some danger, not all such actions create the type of constitutionally cognizable "special" danger that can give rise to a duty to protect under the Due Process Clause. *Id.* at 572.

The Tenth Circuit has adopted a six-part test to determine when government defendants create a constitutionally cognizable danger:

> the plaintiff must show that (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience.

*Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008); *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1182–83 (10th Cir. 2002); *Armijo*, 159 F.3d at 1262–63; *Uhlrig*, 64 F.3d at 574.

Two of these elements are especially relevant here. The first element establishes the threshold requirement that the government must have created the danger or increased the plaintiff's vulnerability to the danger in some way. "[I]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *Armijo*, 159 F.3d at 1263.

The sixth element—whether the conduct, when viewed in total, shocks the conscience—may be the most difficult to satisfy. As the Tenth Circuit has explained, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Uhlrig*, 64 F.3d at 574. Rather, the challenged conduct must manifest "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* The Supreme Court has "repeatedly emphasized that only the most egregious official conduct" meets this standard. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

14

"[T]he measure of what is conscience shocking is no calibrated yard stick" and is not "subject to mechanical application." *Id*. at 847, 850. Rather, an "exact analysis of circumstances" is required "before any abuse of power is condemned as conscience shocking." *Id*. at 850. The Court has, however, indicated both that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process" and that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*. at 849.

**1.**

Mr. Ainsworth's allegations do not support a reasonable inference that Principal Sutherland, Mr. Jensen, or any other School District employee created the danger that ultimately claimed RA's life or in any way increased Mr. Ainsworth's or his children's vulnerability to that danger. Mr. Ainsworth does not allege that school officials produced the U-47700 that caused RA's death, introduced the children to this substance, or otherwise facilitated their abuse of this deadly drug. To the contrary, the allegations make clear that the children had access to this drug before school officials had even heard of it. *See* Compl. ¶¶ 17–24. The school officials "could not have created a danger that already existed." *Armijo*, F.3d at 1263. And again, school officials played no role in RA's tragic death, which occurred neither on school property nor during school hours, but at the Ainsworth home during the night. Nor are there any allegations that U-47700 was sold, distributed, or used during school time and on school property—let alone that school officials facilitated or even were aware of such activity.

To be sure, school officials did eventually learn of the dangers of U-47700, and they took some steps to protect the Ainsworths from this deadly substance. They called Mr. Ainsworth and

15

RA into the school office, expressed concern for RA's safety, and recommended that he be taken to the emergency room for an evaluation. *See* Compl. ¶¶ 61–69. They also told Mr. Ainsworth about U-47700, mentioned that the police believe that GS may have taken the substance, and participated in issuing a community drug alert that warned of the dangers of this drug. *See id.* ¶¶ 71, 83, 91.

Perhaps school officials could and should have done more. The Due Process Clause, however, did not require them to do anything at all to protect the Ainsworths against a danger neither created nor facilitated by the School District. Nor did any of the school officials' actions increase the Ainsworths' vulnerability to the dangers of U-47700. School officials did not place the Ainsworths in a position of danger, strip them of their ability to defend themselves, or cut off potential sources of private aid, the "key[s] to the state-created danger cases." *Armijo*, 159 F.3d at 1263.

The Supreme Court's decision in *DeShaney* is instructive here. There, the Court held that a State had no constitutional duty to protect a child even though it "may have been aware of the dangers" he faced from his abusive father and even though it had "once offered him shelter" by taking him into temporary custody. *DeShaney*, 489 U.S. at 201. Despite the State's having temporary custody of the child, the Court held that the State did not violate the Due Process Clause by returning him to his abusive father's custody because doing so "placed him in no worse position than that in which he would have been had it not acted at all." *Id.* The Court thus concluded that the State "played no part" in creating the danger, "nor did it do anything to render [the child] any more vulnerable." *Id.*

In this case, school officials' attempts to protect the Ainsworths were not enough to prevent RA's overdose and death. But even if insufficient to avert tragedy, these attempts did not

16

place the Ainsworths in a worse position than if the school officials had done nothing at all. The court thus holds that Mr. Ainsworth has failed to allege facts that would support application of the danger-creation exception to Principal Sutherland, Mr. Jensen, or any of the unnamed School District employees.

2.

Whether this exception applies to Lieutenant Little and the unnamed police officers is a closer question. As with the school officials, Mr. Ainsworth's allegations fail to support a reasonable inference that the police created the danger his children faced from U-47700. At least some of the alleged actions taken by the police may have increased the Ainsworths' vulnerability to this danger, however. Specifically, Mr. Ainsworth alleges that although the police knew of U-47700 and its dangers as early as September 3, 2016, they instructed school officials not to disclose any information about GS's death because of an ongoing investigation. *See* Compl. ¶¶ 21, 65. Even more strikingly, Mr. Ainsworth alleges that after GS's death but before RA's death, GS's parents told the police that they intended to call Mr. Ainsworth to inform him that his son, RA, was probably in possession of and using U-47700. *See id.* ¶ 135. Lieutenant Little, however, instructed GS's parents not to speak with Mr. Ainsworth. *See id.* ¶¶ 136–38. In hindsight, Lieutenant Little stated his belief that "if he or other officers had notified [Mr. Ainsworth], it would likely have prevented RA's death." *Id.* ¶ 137.

These actions may well have prevented Mr. Ainsworth from obtaining vital information that might have led him to take additional steps to protect RA. To be sure, Mr. Ainsworth was aware of U-47700, conducted multiple thorough searches of his house and the boys' backpacks, and took RA to the emergency room for a substance abuse evaluation. But perhaps additional information would have prompted Mr. Ainsworth to do still more. After RA's death, Mr.

17

Ainsworth took JA to a residential treatment center so that he could be observed around-the-clock by professional staff, *see* Compl. ¶ 121, and it is possible that he might have done the same for both RA and JA before the tragedy had he received a more concrete and specific warning of the danger facing his sons.

The court nevertheless concludes that even if Lieutenant Little and the unnamed police officers may have increased the Ainsworths' vulnerability to this danger, their actions did not violate the Due Process Clause under the danger-creation exception because they do not meet the high threshold required for conduct to "shock the conscience." First, Mr. Ainsworth's allegations do not support a reasonable inference that any of the actions taken by the police were "intended to injure in some way unjustifiable by any government interest." *County of Sacramento,* 523 U.S. at 849. In this case, the police responded to a series of tragic events by investigating, withholding some information until the investigation was complete but providing other information through a community drug alert that identified U-47700 and warned of its dangers, and discouraging two emotional parents from calling another parent. *See* Dkt. No. 32 at 22.

Even if these actions caused injury, the court cannot reasonably infer that the police did so in a way unjustifiable by any government interest. Instructions to school officials not to provide information about GS's death may have been justified in light of the on-going investigation. Law enforcement officers often have legitimate reasons to keep quiet about an ongoing investigation, such as not releasing unconfirmed information that may fuel false or inaccurate rumors, avoiding tipping off targets who might destroy evidence or flee, and protecting victims' privacy. And in stopping GS's parents from calling Mr. Ainsworth, Lieutenant Little apparently intended to prevent "an emotional parent calling and accusing another parent of doing something when it should be law enforcement's responsibility to make

those connections and contacts." *See* Compl. ¶ 138. The court cannot reasonably infer that the government had no legitimate interest in preventing this sort of potentially emotional confrontation.

Nor can the court reasonably infer that the police's actions were intended to prevent Mr. Ainsworth from learning about the danger to his sons or otherwise to cause injury. To the contrary, the injury that may have resulted from these actions appears to be the sort of "negligently inflicted harm" that "is categorically beneath the threshold of constitutional due process." *County of Sacramento*, 523 U.S. at 849. Lieutenant Little did not tell GS's parents that Mr. Ainsworth should not be told of the danger facing his son; rather, he told them that it was law enforcement's responsibility to notify Mr. Ainsworth. *See* Compl. ¶ 138. And while Lieutenant Little may not have contacted Mr. Ainsworth himself, his deposition testimony quoted in the complaint indicates that he thought—perhaps negligently—that other officials would do so. *See id.* ¶¶ 139–40.

To be sure, conduct that shocks the conscience may not be limited to actions "intended to injure in some way unjustifiable by any government interest." But considering all of the circumstances here—including not only the challenged actions but also the Department's role in issuing the community drug alert—as well as "the need for deference to local policymaking bodies in making decisions impacting upon public safety," *Uhlrig*, 64 F.3d at 573, the court cannot conclude that the alleged actions of Lieutenant Little and the unnamed police officers— even if more than negligent and thus not "categorically beneath the threshold of constitutional due process"—were otherwise "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience," *County of Sacramento*, 523 U.S. at 847 n.8, 849.

### D.

Because the individual Defendants' conduct did not violate the constitution, *a fortiori* it did not violate any clearly established rights.

### III.

It is well settled that "[a] municipality may not be held liable [under § 1983] where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Because Mr. Ainsworth does not allege any constitutional violations by Principal Sutherland, Mr. Jensen, Lieutenant Little, or any other school or police official, neither the School District nor the City can be held liable under Section 1983. *See Hinkley v. Salt Lake City Corp.*, 426 F. Supp. 3d 1207, 1220 (D. Utah 2019).

\*     \*     \*

The facts of this case are indeed tragic. Mr. Ainsworth lost his teenage son to a dangerous substance. And perhaps RA's death could have been avoided if the Defendants had acted differently. Although the court feels deep sympathy for Mr. Ainsworth's loss, the facts alleged here do not establish a constitutional violation under controlling precedent. Defendants' motions to dismiss are accordingly **GRANTED** and this action is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

DATED this 27th day of January, 2021.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge